**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kimbo Theresa Savino, | No. CV-18-0446-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew M. Saul,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 18). Defendant filed his Brief ("Response") (Doc. 19), and Plaintiff filed her Reply (Doc. 20). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.     BACKGROUND**

*A.     Procedural History*

On October 3, 2014, Plaintiff protectively filed a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of April 25, 2013 due to HIV positive status, severe depression and/or adjustment disorder, fibromyalgia, osteoarthritis,

---

[1] The Court takes judicial notice that Nancy A. Berryhill is no longer Acting Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Commissioner of the SSA, Thomas M. Saul, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* Fed. R. App. P. 43(c)(2).

peripheral neuropathy, migraines, venous insufficiency with chronic edema, Chronic Obstructive Pulmonary Disease ("COPD") with allergy-induced asthma and mild emphysema, sleep apnea, and hemorrhagia. *See* Administrative Record ("AR") at 15, 18, 165–66, 178–80, 295, 316, 320, 377. The Social Security Administration ("SSA") denied this application on February 4, 2015. *Id.* at 15, 165–78, 192–95. On February 20, 2015, Plaintiff filed a request for reconsideration, and on March 30, 2015, SSA denied Plaintiff's application upon reconsideration. *Id*. at 15, 179–91, 196, 197–200. On May 13, 2015, Plaintiff filed her request for hearing. *Id.* at 15, 204. On October 31, 2016, a hearing was held before Administrative Law Judge ("ALJ") Charles Davis and on March 7, 2017, a supplemental hearing was held. *Id.* at 15, 74–135. On August 23, 2017, the ALJ issued an unfavorable decision.[2] AR at 12–34. On October 17, 2017, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 7, 2018, review was denied. *Id.* at 1–6, 290–94. On September 4, 2018, Plaintiff filed this cause of action. Compl. (Doc. 1).

### B. Factual History

Plaintiff was fifty-two (52) years old at the time of the administrative hearings and forty-eight (48) at the time of the alleged onset of her disability. AR at 32,74, 108, 165, 178–80, 247, 264, 277, 279, 282, 295, 316, 377. Plaintiff obtained a high school diploma and attended two (2) years of college. *Id.* at 178–79, 321. Prior to her alleged disability, Plaintiff worked as a resident relations director for an apartment complex, a security guard, waitress, and bartender. *Id.* at 32, 78–84, 322, 367–72.

. . .

. . .

. . .

. . .

---

[2] In his decision, the ALJ noted that Plaintiff had "previously filed an application for disability insurance benefits and supplemental security income which was denied in a decision dated April 12, 2013 (Exhibit B-1A)." AR at 15. The ALJ reviewed the pertinent Acquiescence Ruling and "performed a de novo review of all findings as of the claimant's alleged onset date in the current application." *Id.* at 16.

1. **Plaintiff's Testimony**

   a. **Administrative Hearing**[3]

At the initial administrative hearing, Plaintiff reviewed her work history, which included a security guard, resident relations director for a condominium/apartment conversion, as a waitress, and a bartender. AR at 78–84. Plaintiff testified that she lived with her aging mother and brother. *Id.* at 84–85. Plaintiff further testified that she cooks, does her own laundry, can drive, occasionally does the grocery shopping, and takes her dog out in the apartment complex. *Id.* at 85–87. Plaintiff also reviewed her current conditions, medications, and treatment. *Id.* at 87–97.

On March 7, 2017, at the supplemental administrative hearing, Plaintiff confirmed that she has to keep moving, has problems with her knees, cyclical vomiting, problems with her thought process, and severe migraines. *Id.* at 120–21. Plaintiff also confirmed that she was still living with her mother and brother. AR at 122. Plaintiff testified that her cyclical vomiting had improved some, and although she had an episode approximately two (2) weeks prior to the hearing, it only lasted a day or day and a half. *Id.* at 122–23. Plaintiff further testified that she had more recently been diagnosed with pulmonary hypertension and was having some bladder issues. *Id.* at 123. Plaintiff also testified that she regularly needs to change positions, because she gets stiff easily. *Id.* Plaintiff reported that she can sit for approximately fifteen (15) to twenty (20) minutes and can stand for only five (5) to ten (10) minutes. *Id.* at 124. Plaintiff also indicated that she can lift approximately ten (10) pounds, but has been having trouble with her right hand recently. AR at 124. Plaintiff testified that she drops things, has difficulty writing and typing, and has difficulty opening jars and doors. *Id.* at 124–25. Plaintiff further testified that she has migraines approximately six (6) or seven (7) days per month, and takes medication, as well as lays in a dark room away from other people. *Id.* at 125–26.

---

[3] The ALJ appears to have relied on the March 7, 2017, Supplemental Administrative Hearing. *See* AR at 15. As such, the Court only provides a cursory overview of Plaintiff's testimony at the Initial Administrative Hearing.

### b. Administrative Forms

#### i. *Function Report—Adult*

On December 27, 2014, Plaintiff completed a Function Report—Adult in this matter. AR 355–366. Plaintiff reported that she lived in an apartment with family. *Id.* at 355. Plaintiff described the limitations of her medical conditions as follows:

> Psychologically, I have increasingly isolated myself socially, still unable to cope w/exactly what the physical impairments have taken from me. Physically, I have had little to no energy, often needing naps in the middle of the day. I hurt all of the time, even w/ the medication, but I don't want to take the narcotic pain relievers, because my brain is foggy enough most days. I limit my showers most days, because I dread the pain caused by the water on my skin (neuralgia pain). Due to the chronic urinrary [sic] stress incontinence, I often leak through my clothes even when wearing pads, which I always do.
>
> If I'm around too many people, or too much noise, I get jittery, most often turning to anxiety/panic attacks, even if I know/am familiar with either. I struggle climbing steps, up or down, due to pain in my hips (bursitis), knees (osteoarthritis), and sometimes even my feet (plantar fasicitis [sic]). When standing in one place, it is only a short time before my lower back starts burnin [sic]/aching and I have to lean on something to alleviate the pressure. It's a little better if I'm actually moving/walking, but I can only walk short distances before my knees start hurting w/ my lower back and I have to stop and rest. If I sit, I must consistently move & adjust my position, and even then it is hard for me to stand and walk because the stiffness sets in quickly. In all 3 instances, standing in one place, moving/walking, & especially sitting too long, my ankles, feet and calves start to swell from the venous insufficiency.
>
> My memory has been affected & I have to set alarms to remember simple things, like taking my medication. I forget words, even easy ones sometimes, and recall is slow. Reading is difficult because my mind wanders, and it took me close to 2 hours just to write his page and the previous one.
>
> My muscles are weak, my stomach often hurts from the gastritis, I rarely sleep w/o waking up multiple times thru the night, so I am always tired. Trying to get on my knees is a painful struggle, kneeling is worse & I have to use objects or a wall to try & stand again.

*Id.* at 355–56. Plaintiff described her usual day as having coffee while waiting for her

stiffness to go away, getting dressed, eating a small breakfast, going to appointments or sometimes the store, sometimes getting on the computer or watching television, taking her dog out for a short walk, doing needlework or sewing, eating an early dinner, taking her dog out for an evening walk, and watching television while crocheting, then going to bed. *Id.* at 357–58. Plaintiff reported that she feeds and waters her dog, takes her out twice per day, bathes her in the sink, and plays with her. *Id.* at 357, 360. Plaintiff also reported that her mother sometimes feeds and waters her dog or plays with her. AR at 357.

Plaintiff indicated that prior to her illness she was able to do "everything" and was very social and active, including reading and writing books, working around the house and outside of the home, and spending time with her children and grandchildren. *Id*. at 357–58. Plaintiff reported that she now has sleep apnea due to the weight gain resultant from her medications and emotional distress. *Id.* at 357. Plaintiff further reported that regarding her personal care, dressing is difficult because of her balance issues, showers are often painful, her hair usually stays in a braid, and she has difficulty sitting and standing to use the toilet. *Id.* at 359. Plaintiff noted that sometimes her mother reminds her to take care of her personal needs and to take her medication. *Id.* Plaintiff also reported that she tries to eat healthy and cooks daily, with preparation time up to an hour. AR at 359. Plaintiff reported that she does laundry at the laundromat and washes dishes, but has difficulty with dusting and bathroom cleaning because she is sensitive to cleaning products and allergens. *Id*. at 361. Plaintiff indicated that her mother initiates tasks because of Plaintiff's lack of energy. *Id.* at 360.

Plaintiff reported that she can drive, but sometimes is unable to go out alone due to migraines or her medications. *Id.* Plaintiff further reported that she is able to shop on the computer, and sometimes for groceries in the store. *Id.* Plaintiff also reported that she can pay bills, count change, handle a savings account, and use a checkbook or money orders. AR at 362. Plaintiff noted that she has to be careful with money since the onset of her conditions because she is more forgetful now. *Id.* Plaintiff listed her pre-illness hobbies to include reading, writing, television, sewing, crocheting or knitting, and being on the

computer. *Id.* Plaintiff reported that she does not read anymore, does a little writing, watches television daily, rarely sews, crochets when her hands do not hurt, and cooks most of the time. *Id.* Plaintiff described spending time watching television with her mother, texting with her children and other family members, and talking on the telephone or with people that she encounters while walking her dog. *Id.*

Plaintiff indicated that she does not go out on a regular basis, and when she does requires reminders and someone to accompany her. AR at 362. Plaintiff described that since her conditions began her social contact has dropped and she is depressed and reserved. *Id.* at 363. Plaintiff reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, and understand. *Id.* Plaintiff further reported being able to walk between one-half and one block before needing rest. *Id.* Plaintiff also reported that she can pay attention a maximum of ten (10) minutes at a time. *Id.* Plaintiff indicated that she can follow written and spoken instructions, but sometimes needs to either reread or have the instructions repeated. AR at 363.

Plaintiff noted that she is able to get along with authority figures and has never been fired or laid off because she could not get along with people. *Id.* at 364. Plaintiff further reported that she does not handle stress well, and needs time to adjust to changes in routine due to anxiety, panic attacks, and fear of rejection. *Id.* Plaintiff also reported that she uses a cane occasionally and glasses for reading. *Id.*

### ii. *Work History Report*

Plaintiff also completed a Work History Report. AR at 367–74. Plaintiff listed her prior work as a resident relations director at an apartment complex, security officer, waitress, and bartender.[4] *Id.* at 367. Plaintiff described the position of resident relations director as addressing resident issues and working with maintenance to triage work orders. *Id.* at 368. Plaintiff reported that while in this position, she used machines, tools, or

---

[4] Plaintiff also listed Director of Continuing Education and Business Administrator/Human Resources Director; however, these were determined by the ALJ to be too remote in time. *See* AR 127.

- 6 -

1  equipment; technical knowledge or skills; and wrote, completed reports, or performed
2  similar duties; she wrote, typed, or handled small objects for between four (4) and six (6)
3  hours per day; sat for three (3) to four (4) hours; walked for between two (2) and three (3)
4  hours; stood for between one (1) and two (2) hours; climbed, stooped, knelt, crouched,
5  handled, grabbed or grasped large objects for an hour or less per day; and never crawled.
6  *Id.* Plaintiff further reported that she frequently lifted twenty (20) pounds, and the heaviest
7  weight she lifted was fifty (50) pounds. *Id.* Plaintiff indicated that she supervised between
8  eight (8) and ten (10) people as a lead worker for between one (1) and two (2) hours per
9  day. AR at 368.

Plaintiff described the position of security officer as involving checking credentials and operating the gate access control, as well as driving a golf cart around the community and climbing stairs in the apartment buildings to ensure the security and safety of residents, guests, and personnel. *Id.* at 369. Plaintiff reported using machines, tools, or equipment; technical knowledge or skills; and writing, completing reports, or performing similar duties. *Id.* Plaintiff further reported that the position required her to stand for between six (6) and eight (8) hours; write, type, or handle small objects for between three (3) and four (4) hours; walk and reach for between two (2) and three (3) hours; climbed for between one (1) and two (2) hours; sit or stoop for one (1) hour or less; and never kneeled, crouched, crawled, or handled, grabbed, grasped large objects. *Id.* Plaintiff noted that she did not frequently lift anything, and the heaviest weight she lifted was less than ten (10) pounds. *Id.* Plaintiff indicated that she supervised four (4) to six (6) people for between two (2) and three (3) hours per day. AR at 369.

Plaintiff described her position of waitress and bartender as taking orders from customers, submitting those orders, and delivering orders to customers, as well as being on standby for customer needs, cleaning, and restocking. *Id.* at 370. Plaintiff noted that in this position she used machines, tools, or equipment; technical knowledge or skills; and wrote, completed reports, or performed similar duties. *Id.* Plaintiff reported walking, standing, reaching, and writing, typing, or handling small objects for between six (6) and

eight (8) hours per day; climbing and stooping for between one (1) and two (2) hours per day; crouching, and crawling for between one (1) hour or less; and never sitting, kneeling, or crawling. *Id.* Plaintiff indicated that she frequently lifted ten (10) pounds, and that fifty (50) pounds was the heaviest weight that she lifted. *Id.* Plaintiff further reported that she supervised between one (1) and two (2) people at a time. AR at 370.

### 2. **Medical Expert Edward Jasinski's Testimony**

Mr. Edward J. Jasinski, Ph.D. testified as a medical expert at the supplemental administrative hearing. AR at 15, 112–20. Dr. Jasinski addressed mental health treatment records that he reviewed from the alleged date of onset forward. *Id.* at 113. Dr. Jasinski noted that Plaintiff's diagnoses changed over the course of treatment. *Id.* at 113–14. Dr. Jasinski also testified that he reviewed two mental health evaluations, one from December 2016 and one dated February 17, 2017. *Id.* at 113. Dr. Jasinski opined that regarding the B Criteria, Plaintiff would have mild limitation in understanding, remembering, and applying information; interacting with others; and concentration, persistence, and maintaining pace. *Id.* at 114. Dr. Jasinski further opined that Plaintiff would have moderate limitations on her ability to adapt and manage oneself. AR at 114. Dr. Jasinski confirmed that he concluded that Plaintiff's limitations did not meet or equal a listing. *Id.*

Dr. Jasinski also opined that the limitations he listed would not be significant enough to impact work performance. *Id.* Dr. Jasinski explained that his finding that Plaintiff was moderately limited in her ability to adapt and manage herself, specifically addressed the consultative examiner's statement that Plaintiff's impairments may be more significant under greater demand. *Id.* at 116–17. Plaintiff's counsel asked about an individual that "had a hard time responding to stress in the workplace, would that limit their ability to function in a high-stress environment?" *Id.* at 117. Dr. Jasinski confirmed that it might be difficult for such an individual. AR at 117. Plaintiff's counsel also asked, "If this individual had difficulty adapting to a high-stress environment, would she need to be in an environment with more simple instructions, or you know, less social contact?" *Id.* at 118. Dr. Jasinski testified that he did not see any issues, noting that the IQ testing did

not indicate any significant issues with cognitive functioning which is why he placed a mild limitation in that area. *Id.* Dr. Jasinski further pointed out that even if Plaintiff had a higher level of IQ functioning previously and subjectively felt a cognitive loss, objectively, her mind is still working well within the normal range. *Id.* at 118–19.

### 3. <u>Vocational Expert Cheryl Chandler's Testimony</u>

Ms. Cheryl R. Chandler testified as a vocational expert at the supplemental administrative hearing. AR at 15, 126–33. Ms. Chandler classified Plaintiff's past work as waitress, bartender, security guard, and manager, apartment house.[5] *Id.* at 127. Ms. Chandler described Plaintiff's past relevant work as a waitress, Dictionary of Occupational Titles ("DOT") number 311.477-018, with a Specific Vocational Preparation ("SVP") of 3—semiskilled, and an exertional level of light. *Id.* 127–28. Ms. Chandler further described Plaintiff's past work of bartender, DOT number 312.474-010, an SVO of 3, and a light exertional level. *Id.* at 128. Ms. Chandler also described the position of security guard, DOT number 327.667-034, with an SVP of 3, and a light exertional level. *Id.* Finally, Ms. Chandler described the position of manager, apartment house, DOT 186.167-018, with an SVP of 5—skilled, and a light exertional level. AR at 128.

The ALJ asked Ms. Chandler to consider a hypothetical individual of the claimant's age and education, with the same work history, and the residual functional capacity to perform a range of work, including can lift and carry up to twenty (20) pounds occasionally and ten (10) pounds frequently, stand and walk up to six hours of an eight (8) hour workday, sit for up to six hours of an eight (8) hour workday, but requires the ability to alternate between sitting and standing approximately every thirty (30) minutes, the occasional climbing of ramps and stairs, occasional balance, stoop, kneel, crouch, and crawl, no ladders, ropes, or scaffolds, no concentrated exposure to pulmonary irritants, fumes, odors, dust, gases, et cetera, no workplace hazards, and not production quotas or an assembly line pace. *Id.* at 128–29. Ms. Chandler opined that the waitress, bartender, and security guard

---

[5] Ms. Chandler considered manager, apartment house as the closest listing to Plaintiff's past work as a residential relations director. AR at 127.

would not exist for such an individual because of the sit/stand option. *Id.* at 129. Ms. Chandler opined that she would expect the apartment management to have more flexibility with regard to the sit/stand, as well as meet the other requirements. *Id.* Ms. Chandler testified that such an individual could also perform the position of unskilled cashier, DOT number 211.462-010, with an SVP of 2, and light exertional level. *Id.* at 129–30. Because of the sit/stand requirement, Ms. Chandler eroded the availability numbers by ninety (90) percent and testified that there would be 94,000 jobs available in the national economy. AR at 130, 132. Ms. Chandler also suggested the position of counter clerk, DOT number 249.366-010, with an SVP of 2, and light exertional level. *Id.* at 130. Ms. Chandler again eroded the jobs available, which left approximately 10,000 jobs available in the national economy. *Id.* at 130, 132. Ms. Chandler confirmed that her testimony was consistent with the DOT or otherwise based on her experience and observation. *Id.*

Plaintiff's counsel asked about the demands placed on an individual in the apartment manager's job, specifically regarding the level of stress. *Id.* Ms. Chandler testified that in her experience that as a resident manager, you may get middle of the night calls, but if the job is not as a resident manager, the position is routine. AR at 131. Ms. Chandler further noted that based on her review of the description provided in Plaintiff's work history it was unclear whether it was a resident manager position or a standard eight (8) hour per day, forty (40) hour work week position. *Id.* Plaintiff's counsel also asked about the employability of a person who had to miss five (5) to six (6) days per week. *Id.* Ms. Chandler opined that such a person would not be able to maintain competitive employment. *Id.* at 131–32. Upon further questioning by Plaintiff's counsel, Ms. Chandler opined that a person who had manipulative limitation with their dominant hand, including occasional reaching, grasping, fingering, handling, or feeling, would not be able to maintain the employment that she had previously suggested. *Id.* at 132.

### 4. <u>Lay Witness Testimony</u>

On December 27, 2014, Barbara Leipart completed a Function Report—Adult in this matter. AR 344–54. Ms. Leipart reported that Plaintiff lived in an apartment with

family. *Id.* at 344. Ms. Leipart described the limitations of Plaintiff's medical conditions as follows:

> Isolated self socially, unable to cope physically. No enengey [sic] & need to take naps often during the day. Hurting all the time even when taking meds. Brain is foggy a lot. Doesn't shower often because of pain from water. Have urinary incontinence often changing pad & clothes when coughing. Have panic attacks around crowded places especially noise. Trouble climbing stairs due to pain in hips, knees & feet. Back hurts if standing a short time. Have to lean on something to take pressure off, or have to walk to help pain a little. Walk only short distances. Can't sit too long & have to adjust position often. Stiffness sets in when she I stands [sic]. Ankles & feet swell. Set alarm to take meds or I forgets [sic]. Memory loss w/ simple words. Weak muscles, stomach hurts from gastritis. Sleep disrupted often so always tired. Can't get on knees, because it's painful & hard to stand back up w/out using something to hold on to.

*Id.* at 344–45. Ms. Leipart described Plaintiff's usual day as having coffee while waiting for her stiffness to go away, getting dressed, eating a small breakfast, going to appointments or sometimes the store, sometimes getting on the computer or watching television, taking her dog out for a short walk, doing needlework or sewing, eating an early dinner, taking her dog out for an evening walk, and watching television while crocheting, then going to bed. *Id.* at 346. Ms. Leipart reported that Plaintiff feeds and waters her dog, takes her out twice per day, bathes her in the sink, and plays with her. *Id.* at 346, 348. Ms. Leipart also reported that Plaintiff's mother sometimes feeds and waters her dog or plays with her. AR at 346.

Ms. Leipart indicated that prior to Plaintiff's illness she was able to do "everything" and was very social and active, including reading and writing books, working around the house, and outside of the home. *Id*. Ms. Leipart reported that Plaintiff now has sleep apnea due to the weight gain resultant from her medications and inactivity. *Id.* Ms. Leipart further reported that regarding Plaintiff's personal care, dressing is difficult because of her balance issues, showers are often painful, her hair usually stays in a braid, and she has difficulty sitting and standing to use the toilet. *Id.* at 347. Ms. Leipart noted that sometimes Plaintiff's mother reminds her to take care of her personal needs and to take her medication.

*Id.* Ms. Leipart also reported that Plaintiff tries to eat healthy and cooks daily, although the preparation time is slow. AR at 347. Ms. Leipart reported that Plaintiff does laundry at the laundromat and washes dishes, but has difficulty with dusting and bathroom cleaning because she is sensitive to cleaning products and allergens. *Id.* at 349. Ms. Leipart indicated that Plaintiff's mother initiates tasks because of Plaintiff's lack of energy. *Id.* at 348.

Ms. Leipart reported that Plaintiff can drive, but sometimes is unable to go out alone due to migraines or her medications. *Id.* Ms. Leipart further reported that Plaintiff is able to shop on the computer, and sometimes for groceries in the store. *Id.* Ms. Leipart also reported that Plaintiff can pay bills, count change, handle a savings account, and use a checkbook or money orders. AR at 350. Ms. Leipart noted that Plaintiff has to be careful with money since the onset of her conditions because she is more forgetful now. *Id.* Ms. Leipart listed Plaintiff's pre-illness hobbies to include reading, writing, television, sewing, crocheting or knitting, and being on the computer. *Id.* Ms. Leipart reported that Plaintiff does not read anymore, does a little writing, watches television daily, rarely sews, crochets when her hands do not hurt, and cooks most of the time. *Id.* Ms. Leipart described Plaintiff spending time watching television with her mother, texting with her children and other family members, and talking on the telephone or with people that she encounters while walking her dog. *Id.*

Ms. Leipart indicated that Plaintiff does not go out on a regular basis, and when she does requires reminders and someone to accompany her. AR at 350. Ms. Leipart described that since Plaintiff's conditions began her social contact has dropped and she is depressed and reserved. *Id.* at 351. Ms. Leipart reported that Plaintiff's conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember, complete tasks, concentrate, and understand. *Id.* Ms. Leipart further reported that Plaintiff can walk between one-half and one block before needing rest. *Id.* Ms. Leipart also reported that Plaintiff can pay attention a maximum of ten (10) minutes at a time. *Id.* Ms. Leipart indicated that Plaintiff can follow written and spoken instructions, but needs to either

reread or have the instructions repeated. AR at 351.

Ms. Leipart noted that Plaintiff is able to get along with authority figures and has never been fired or laid off because she could not get along with people. *Id.* at 352. Ms. Leipart further reported that Plaintiff does not handle stress well, and needs time to adjust to changes in routine due to anxiety, panic attacks, and fear of rejection. *Id.* Ms. Leipart also reported that Plaintiff uses a cane occasionally and glasses for reading. *Id.*

### 5. Plaintiff's Medical Records[6]

On January 24, 2014, Plaintiff was seen by Leonard Cosmo, M.D. regarding sleep apnea-obstruction, daytime hypersomnolence, insomnia, and snoring. AR at 535–39. Plaintiff denied chest congestion, cough, and wheezing. *Id.* at 536. Treatment records indicate that Plaintiff had benign percussion and breath sounds were clear bilaterally. *Id.* at 537. Plaintiff underwent a breathing capacity test. *Id.* at 538, 542. Test results only indicated pre-bronchodilator results. *Id.* at 542. Test records further indicated that the test quality was questionable per American Thoracic Society ("ATS") and European Respiratory Society ("ERS") guidelines. AR at 542. Upon review of Plaintiff's breathing capacity test, chest radiographs, and electrocardiogram results, Dr. Cosmo diagnosed unspecified asthma, with exacerbation. *Id.* at 538.

Treatment records consistently indicated that Plaintiff's COPD was well controlled with combivent/singular. *Id.* at 589, 613, 631.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's

---

[6] The Court has reviewed the entirety of Plaintiff's medical records; however, Plaintiff's arguments regarding the medical records are limited to Plaintiff's COPD. *See* Opening Br. (Doc. 18). As such, the Court's summary is limited to records relevant to that issue from her alleged onset date forward.

findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III. ANALYSIS

### A. *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.

If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 3, 2014. AR at 18. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: asymptomatic human immunodeficiency virus (HIV) positive, obesity, asthma, chronic obstructive pulmonary disease (COPD), migraine headaches, lumbar degenerative disc disease, major depressive disorder, anxiety disorder, urinary incontinence, degenerative joint disease of the knees and feet, fibromyalgia, sleep apnea (20 CFR 416.920(c))." *Id.* The ALJ further indicated that "[t]he record also includes evidence of two non-severe impairments: history of uterine bleeding and venous insufficiency[.]" *Id.* The ALJ also found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." *Id.* at 19. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that the claimant can lift and carry 20 pounds occasionally, 10 pounds frequently, can sit for 6 hours, stand and walk for 6 hours in an 8 hour workday, requires the ability to alternate between sitting and standing every 30 minutes[;] . . . can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds, cannot tolerate concentrated exposure to pulmonary irritants, fumes, dusts, or gases, and no workplace hazards[;] . . . [and] is further limited to work that does not require satisfaction of production quotas or an assembly line pace." *Id.* at 23. At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work as an apartment manager (DOT 186.167-018)[,] [as] [t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965)." AR at 32. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.* at 33.

Plaintiff asserts that the ALJ erred by failing to further develop the record with respect to whether Listing 3.02 was met or medically equaled. *See* Opening Br. (Doc. 18) at 7–8. Plaintiff further asserts that the ALJ erred in his interpretation of the medical expert's testimony when formulating the RFC. *See id.* at 8–10.

### ***B.     Listing 3.02***

Plaintiff argues that the ALJ erred by failing to develop the record further in light of Plaintiff's breathing capacity test. Opening Br. (Doc. 18) at 7–8.

Listing 3.02A requires that for an individual sixty-eight (68) inches tall (Plaintiff's height), the $FEV_1$ must be less than or equal to 1.45L. 20 C.F.R. § 404, Subpart P, App. 1 at § 3.02A and Table I. The regulations further explain that "[d]uring testing, if your $FEV_1$ is less than 70 percent of your predicted normal value, we require repeat spirometry after inhalation of a bronchodilator to evaluate your respiratory disorder under these listings, unless it is medically contraindicated." 20 C.F.R. § 404, Subpart P, App. 1 at § 3.00(E)(2)(b). Moreover, a claimant's "forced expiratory maneuvers must be satisfactory." *Id.* at § 3.00(E)(2)(c).

Plaintiff argues that because the ALJ noted that Plaintiff's test quality was questionable per ATS/ERS guidelines, he had a responsibility to develop the record. Opening Br. (Doc. 18) at 7. As an initial matter, the claimant bears the burden to show medical evidence consisting of signs, symptoms, and laboratory findings to establish a medically determinable physical or mental impairment. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005); 20 C.F.R. §§ 404.1512, 404.1520, 416.912, 416.920; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). Moreover, the Listing 3.02 requires "*medical evidence* to document and assess the severity of your respiratory disorder." 20 C.F.R. § 404, Subpart P, App. 1 at § 3.00(D)(1) (emphasis in original).

Here, the ALJ carefully reviewed Plaintiff's medical record and found that her COPD was well-controlled with medication and "numerous physical exams have documented that she has clear lungs with no wheezing or signs of respiratory distress[,]" despite continuing to smoke cigarettes regularly. AR at 27. Plaintiff's arguments that the

ALJ failed to develop the record are unavailing and improperly attempt to shift his burden to the ALJ. "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citations omitted). Plaintiff's medical records do not demonstrate any ongoing treatment for her COPD beyond notations that it is well-controlled with medication. As such, "[t]he record before the ALJ was neither ambiguous nor inadequate to allow for proper evaluation of the evidence." *Id.* at 460. The Court finds that the ALJ did not err and his factual findings were based on substantial evidence, and are therefore conclusive. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

### C. *Development of the RFC*

Plaintiff asserts that the ALJ erred by misstating medical examiner's opinion testimony. Pl.'s Opening Br. (Doc. 18) at 8–10. The ALJ stated that Edward Jasinski, Ph.D. "opined that the claimant was limited to work that does not require satisfaction of production quotas or an assembly line pace." AR at 29. Plaintiff is correct that Dr. Jasinski's opinion did not include such a limitation.

Dr. Jasinski opined that regarding the B Criteria, Plaintiff would have mild limitation in understanding, remembering, and applying information; interacting with others; and concentration, persistence, and maintaining pace. *Id.* at 114. Dr. Jasinski further opined that Plaintiff would have moderate limitations on her ability to adapt and manage oneself. *Id.* at 114. Dr. Jasinski confirmed that he concluded that Plaintiff's limitations did not meet or equal a listing. *Id.*

Dr. Jasinski also opined that the limitations he listed would not be significant enough to impact work performance. *Id.* Dr. Jasinski explained that his finding that Plaintiff was moderately limited in her ability to adapt and manage herself, specifically addressed the consultative examiner's statement that Plaintiff's impairments may be more significant under greater demand. AR at 116–17. Plaintiff's counsel asked about an individual that "had a hard time responding to stress in the workplace, would that limit

| | |
|---|---|
| 1 | their ability to function in a high-stress environment?" *Id.* at 117. Dr. Jasinski confirmed |
| 2 | that it might be difficult for such an individual. *Id.* Plaintiff's counsel also asked, "If this |
| 3 | individual had difficulty adapting to a high-stress environment, would she need to be in an |
| 4 | environment with more simple instructions, or you know, less social contact?" *Id.* at 118. |
| 5 | Dr. Jasinski testified that he did not see any issues, noting that the IQ testing did not indicate |
| 6 | any significant issues with cognitive functioning which is why he placed a mild limitation |
| 7 | in that area. *Id.* |
| 8 | In developing the RFC, the ALJ translated Dr. Jasinski's moderate limitation |
| 9 | regarding Plaintiff's ability to adapt and manage herself into not working with the pace |
| 10 | demands of production quotas or assembly line jobs. AR at 128–29. Plaintiff argues that |
| 11 | "it is clear from the medical expert's statements taken as a whole that a need for a low- |
| 12 | stress environment is indicated by the record, . . . [and] the ALJ's RFC does not adequately |
| 13 | encompass a low-stress environment because workplace stress, as a function of a limitation |
| 14 | in adaptation rather than persistence and pace, comes from far more factors than simply |
| 15 | production quotas or assembly line pace." Reply (Doc. 20) at 3. Contrary to Plaintiff's |
| 16 | argument, the ALJ's RFC precluding jobs that have a pace like that required by production |
| 17 | quotas or assembly line jobs is a proper translation of Dr. Jasinski's moderate limitation. |
| 18 | *See, e.g., Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173–76 (9th Cir. 2008). As such, |
| 19 | the Court finds the ALJ's misquoting of Dr. Jasinski's opinion harmless. |
| 20 | . . . |
| 21 | . . . |
| 22 | . . . |
| 23 | . . . |
| 24 | . . . |
| 25 | . . . |
| 26 | . . . |
| 27 | . . . |
| 28 | . . . |

## IV. CONCLUSION

In light of the foregoing, the Court finds that the Commissioner's findings are based upon substantial evidence and without legal error. Therefore, the Court affirms the ALJ's decision.

Accordingly, IT IS HEREBY ORDERED that:

1) Plaintiff's Opening Brief (Doc. 18) is DENIED;

2) The Commissioner's decision is AFFIRMED; and

3) The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 30th day of September, 2019.

Honorable Bruce G. Macdonald
United States Magistrate Judge